**KAZEROUNI LAW GROUP A.P.C.**
Ross H. Schmierer, Esq. (RS-7215)
Abbas Kazerounian, Esq.
(*Pro Hac Vice* Forthcoming)
Jason Ibey, Esq.
(*Pro Hac Vice* Forthcoming)
3000 Atrium Way, Suite 200
Mount Laurel, New Jersey 08054
(732) 588-8688

**SERAPH LEGAL, P.A.**
Bryan Geiger, Esq.
(*Pro Hac Vice* Forthcoming)
1614 N. 19th Street
Tampa, Florida 33605
(813)567-1230

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| Brenden Sica,<br>individually and on behalf of a class of<br>similarly situated persons,<br><br>     Plaintiff,<br><br>     v.<br><br>Minto Development Corporation, Minto<br>Financial d/b/a Minto Money, Benhti<br>Economic Development Corporation,<br>Douglas William Isaacson, and Clarity<br>Services, Inc.,<br><br>     Defendants. | Case Number:<br><br><br><br><br>**JURY TRIAL DEMANDED** |

## <u>CLASS ACTION COMPLAINT</u>

COMES NOW the Plaintiff, **Brenden Sica** ("**Mr. Sica**" or "**Plaintiff**"), on

behalf of himself and all similarly situated individuals, by and through his attorneys

and complains of the Defendants, **Minto Development Corporation** ("**MDC**"),

**Minto Financial d/b/a Minto Money** ("**Minto Money**"), **Benhti Economic**

**Development Corporation** ("**Bedco**"), **Douglas William Isaacson** ("**Isaacson**"), and **Clarity Services, Inc.** ("**Clarity**") (collectively, the "**Defendants**"), stating as follows:

## DESCRIPTION OF THE CASE

1.  New Jersey law prohibits usury and caps interest rates at 16% annually. *See* N.J. Stat. § 31:1-1(a). Interest rates of 30% and higher for loans to individuals are deemed a crime. *See* N.J. Stat. § 2C:21-19.

2.  MDC, Bedco, Minto Money, and Isaacson (together, the "Lender Defendants") operate an online lending business called "Minto Money."

3.  Minto Money lends to New Jersey residents at rates exceeding 600% annually – more than 37 times the maximum lawful rate.

4.  To evaluate potential borrowers, Minto Money obtains consumer reports from Clarity, a consumer reporting agency which tailors its reports to the subprime lending industry.

5.  MDC and Bedco then attempt to collect these loans, despite their triple-digit interest rates.

## JURISDICTION AND VENUE

6.  This Court has original jurisdiction over this matter pursuant to 28 U.S.C. § 1331, as the unlawful violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO") alleged herein involves a federal question.

7. This Court also has supplemental jurisdiction over Plaintiff's New Jersey causes of action, pursuant to 28 U.S.C. § 1367(a), as Plaintiff's New Jersey causes of action state law claims are so related to Plaintiff's federal claims in this action, that they form part of the same case or controversy.

8. Venue is proper in this Court, pursuant to 28 U.S.C. § 1391(b)(1)-(2) and 18 U.S.C. § 1965(a), because all or some of the unlawful practices and violations of law alleged herein occurred and are occurring in the State of New Jersey. Further, Defendants regularly conduct business within the State of New Jersey.

## PARTIES

9. Mr. Sica is a natural person residing in the City of Elmwood Park, Bergen County, New Jersey.

10. Bedco is an economic development corporation purportedly organized under the laws of the Native Village of Minto and has a primary address of 205 Lakeview Dr., Suite 7, Minto, AK 99758.

11. BEDCO claims to be the owner of an online payday lending website Minto Money, which operates from www.mintomoney.com.

12. MDC is an Alaskan corporation with a registered mailing address of 615 Bidwell Ave., Suite 303, Fairbanks, AK 99701.

13. MDC's registered agent is Roxanne Frank, 938 Dennis Rd., North Pole, AK 99705.

14.     Isaacson is an individual believed to reside at 1003 Shirley Turnaround, North Pole, AK 99705.

15.     Isaacson is the General Manager of Minto Money and the CEO of MDC.

16.     Clarity is a Delaware corporation with a primary business address of 475 Anton Blvd., Costa Mesa, CA 92626.

17.     Clarity's registered agent is The Corporation Trust Company, Corporation Trust Center, 1209 Orange St., Wilmington, DE 19801.

## FACTUAL ALLEGATIONS

18.     On or about July 11, 2022, Mr. Sica obtained a loan in the principal amount of $1,100.00 from Minto Money (the "**Minto Money Loan**").

19.     The Minto Money Loan carried an annual interest rate of 653.65%, meaning that Mr. Sica was to pay $5,877.39 over a ten-month period for a $1,100 loan. **SEE PLAINTIFF'S EXHIBIT A**.

20.     The principal balance of the loan was electronically transmitted to Mr. Sica's Bank of America bank account (ending in 7738) in New Jersey, via an *Automated Clearing House* ("ACH") credit.

21.     Thereafter, Minto Money collected the Minto Money Loan through ACH withdrawals from Mr. Sica's bank account.

22.     Mr. Sica paid approximately $146.97 for the $1,100.00 he borrowed.

**SEE PLAINTIFF'S EXHIBIT B.**

23.     Despite this, Minto Money claimed he still owed $1,552.86 (the "**Debt**").

24.     The Debt arose from a transaction which was primarily for family, personal, and household purposes, specifically it arose from a payday loan which was used for personal purposes and expenses.

25.     At all times relevant, Mr. Sica was a New Jersey resident.

26.     Mr. Sica has never visited Minto tribal land in Alaska.

27.     Recently, federal appellate courts have held that a transaction takes place, for jurisdictional purposes, where a consumer is located when they click "submit" while visiting an online portal provided by a Native American tribe. *See California v. Iipay Nation of Santa Ysabel*, 898 F.3d 960, 968 (9th Cir. 2018) ("… the patrons' act of placing a bet or wager on a game of DRB while located in California constitutes gaming activity that is not located on Indian lands, violates the UIGEA, and is not protected by IGRA.")

28.     Thus, pursuant to current legal decisions, Mr. Sica's loan occurred in the State of New Jersey and is governed by the laws of New Jersey.

29.     Minto Money is purportedly owned and operated by Minto Financial, which, in turn, claims to be owned by The Native Village of Minto (the "**Minto**

**Tribe**"), a small, isolated, financially-strapped American Indian tribe with approximately 223 enrolled members, located about 75 miles northwest of Fairbanks, Alaska.

30.     Minto Money's website states:

> Minto Financial dba Minto Money is a wholly owned subsidiary of Benhti Economic Development Corporation ("BEDCO"), a sovereign economic arm, enterprise and instrumentality of, and created under the laws of and for the benefit of, the Native Village of Minto, a federally recognized sovereign American Indian tribe in Alaska . . ..[1]

31.     Minto Financial and Bedco, in turn, operate under a "tribal lending license" signed by ***Shane Thin Elk*** ("**Thin Elk**"), the *Commissioner* of the Minto Financial Services Licensing & Regulatory Commission. **SEE PLAINTIFF'S EXHIBIT C.**

32.     Just so, the Commission has issued only one license in its existence: the one granted to operate Minto Money.

33.     The Minto Financial Services Licensing & Regulatory Commission was created immediately before issuing this loan license.

34.     The Commission places no restrictions on interest rates charged to consumers, unlike Alaska state law, which limits payday loans to $500 and caps fees at $75 for such loans.

---

[1] https://mintomoney.com/about/ (last accessed Oct. 28, 2022).

35.     Thin Elk is an attorney who previously lived in Omaha, Nebraska, and formerly practiced law with Fredericks Peebles & Morgan LLP, a law firm with a significant practice devoted to, per its website, "PROTECTING Tribal Sovereignty." He is now the owner of Thin Elk Law in Green Bay, Wisconsin, where he resides.

36.     Upon information and belief, Thin Elk is not a member of the Minto Tribe; rather, he is an enrolled member of the Sioux Tribe of South Dakota – located thousands of miles from Alaska.

37.     Thin Elk bills himself as an expert in "rent-a-tribe" matters, an arrangement where non-tribal entities control and operate a lending operation but present a Native American tribe façade as the straw owner to claim tribal sovereign immunity as a defense to any prosecution.

38.     For example, Thin Elk was a speaker at a Tribal Employment Rights & Law Conference in April 2014 in Prior Lake, Minnesota. The program for the seminar summarized his speech as "Structuring the system: Essential elements for workable Tribal codes; selecting or creating effective grievance and dispute resolution bodies and processes; special considerations for partnering with non-Tribal entities for commercial enterprises." **SEE PLAINTIFF'S EXHIBIT D.**

39.     In sum, the Minto Financial Services Licensing & Regulatory Commission issued a single license, to Minto Money, through its Commissioner,

who is not a member of the Minto Tribe, but has expertise in setting up rent-a-tribe agreements with non-tribal investors.

## **Minto Money is Not Beneficially Owned or Operated by the Minto Tribe**

40.     Minto Money operates under a "rent-a-tribe" scheme – a scheme whereby the main function of the Native American tribe is to, at least on paper, own the lending operation so that the true non-tribal lender may use the specter of sovereign immunity as a way to ward off the consumers who they victimize, as well as state and federal regulatory authorities.

41.     Despite the tribe's minimal involvement, all substantive aspects of the payday lending operation – funding, marketing, loan origination, underwriting, loan servicing, electronic funds transfers, and collections – are performed by individuals and entities that are *unaffiliated* with the tribe, often referred to as "service providers."

42.     One of the individuals behind the rent-a-tribe scheme in this matter is Douglas William Isaacson ("Isaacson"), the CEO of MDC and past president of Credit Services, Inc., which was an affiliate of Trans Union, LLC.[2]

43.     Isaacson was born in 1957 in Seattle, Washington, and was not born a member of the Minto Tribe.

---

[2] https://dougisaacson.wordpress.com/about-us/ (last visited Nov. 3, 2022).

44.     On information and belief, Isaacson currently lives in North Pole, Alaska, about 12 miles south of Fairbanks.

45.     As part of the rent-a-tribe scheme, Isaacson, via MDC, obtains credit reports in the name of Minto Money.

46.     Isaacson then contracts with other non-tribal members who perform underwriting analytics, customer service, collection duties, and all other related business functions.

47.     Upon information and belief, MDC employs no members of the Minto Tribe.

48.     Bedco, the purported parent company of Minto Financial, is also controlled by Isaacson.

49.     Domain Name Registration records show that Bedco's only website, www.bedco.us, has been registered to Isaacson. **SEE PLAINTIFF'S EXHIBIT E.**

50.     When aggrieved consumers complain about Minto Money to consumer advocacy organizations such as the Better Business Bureau ("BBB"), Isaacson responds personally to the complaints, identifying himself as the "General Manager" of Minto Financial. **SEE PLAINTIFF'S EXHIBIT F.**

51.     Upon information and belief, Isaacson, apparently without any oversight from the tribe, often makes adjustments to the interest rates charged by Minto Money to consumers who complain of loansharking.

52.     Isaacson also executes contracts on behalf of Minto Financial, in his capacity as General Manager.

53.     Minto Money previously claimed to operate a lending enterprise making millions of dollars of consumer loans to consumers nationwide, from offices located at 205 Lakeview Dr., Suite 7, Minto, AK 99758.

54.     Minto Money now lists only a PO Box address on its website.

55.     Despite the suite number designation, the building located at 205 Lakeview Drive does not contain any offices divided into suites.

56.     The building is used for school and senior lunch programs, community meetings, and village council operations.[3]

57.     No call center, data center, or offices relating to any lending enterprise are found at this address.

58.     The web server from which mintomoney.com operates has an IP address of 35.229.109.76, which corresponds to a physical location in South Carolina. **SEE PLAINTIFF'S EXHIBIT G.**

59.     Indeed, the idea that any company relying on e-commerce to facilitate large numbers of transactions at 205 Lakeview Drive in Minto is dubious, at best,

---

[3] https://www.energy.gov/indianenergy/articles/minto-upgrades-community-lodge-start-support (last visited Nov. 3, 2022).

since the area lacks high-speed internet service providers, offering only DSL service at speeds of just 2 megabits per second.

## **Minto Money Operates from Kansas, Not Alaska**

60.     Calls to the only customer service phone number listed on Minto Money's website, 844-446-4686, were answered by a non-tribal employee working at a call center in Overland Park, Kansas.

61.     Non-tribal employees answering said calls confirmed that no call center or business operations existed in Alaska.

62.     Upon information and belief, no members of the Minto Tribe live in the Overland Park, Kansas, area.

63.     Indeed, the Minto Tribe has no substantive involvement in the operation of Minto Money. Working capital to fund loans is provided by Isaacson and his investors and calls are taken by Isaacson's contractors in Kansas, thousands of miles away from the Minto Village.

64.     The Minto Tribe's Financial Services Licensing & Regulatory Commission is a paper-thin veneer established in an attempt to create the false impression that the tribe is, somehow, involved in the lending business.

65.     Similarly, the Commissioner is not even himself a member of the Minto Tribe and is an attorney who bills himself as an expert in advising Native American tribes how to rent out the appearance of sovereign immunity for profit.

66. On information and belief, Isaacson and the other non-tribal investors receive the vast majority of the payday loan profits while the Minto Tribe receives a tiny fraction of overall revenue for playing the role of straw owner of the business.

67. On information and belief, Isaacson, through his roles as General Manager of Minto Financial and CEO of MDC, and through his role with BEDCO, actually controls Minto Money.

### Minto Money's Communications with Mr. Sica

68. Minto Money emailed and called Mr. Sica several times in an effort to collect on a debt with a usurious interest rate.

69. On or around August 8, 2022, Minto Money emailed Mr. Sica, stating, in pertinent part, as follows:

a) "Did you know that your account is delinquent?"

b) "Did you want to avoid further action on your account by making a payment TODAY?"

c) "We want to help and will work with you ! Avoid further action and call our Payments Team . . .. Ask about options to make up your past due account. The total amount currently delinquent in your account is: $0.00[.]"

70. On or around August 9, 2022, Minto Money emailed Mr. Sica again. Minto Money stated, in pertinent part, as follows:

a) "Our records indicate that your bank returned your recent payment of **$146.97** that was due on **8/5/2022** as **R01**."

b) "Your account is now in collections, and the current outstanding balance is **$1,532.86**."

c) "To avoid this account being placed with a Third Party Collection Agency, we have several options available to help you."

71.     On or around August 10, 2022, Minto Money sent Mr. Sica an email with the same language that was included in the August 8, 2022, email. However, this time, Minto Money indicated that "[t]he total amount currently delinquent on your account is: $1,532.86[.]"

72.     On or around August 12, 2022, Minto Money sent Mr. Sica another email, which stated that he was "**now eligible for a discount settlement on [his] outstanding balance of $1,532.86**."

73.     On or around August 16, 2022, Minto Money sent Mr. Sica an email stating: "We can work together to resolve your account balance! **Our flexible payment builder gives you the freedom to create a plan based on your own time**. Your account also qualifies for a settlement discount."

74.     On or around August 23, 2022, Minto Money emailed Mr. Sica again. The email stated, in pertinent part:

a) "Settling your balance may allow you to get another loan in the future."

b) "Taking care of your balance of $1,552.86 may allow you to get another loan in the future. **You can accept a settlement or create an affordable payment plan 100% online**."

75.     In addition to all these emails, Mr. Sica received several calls from Minto Money's Kansas call center number, 844-446-4686. These calls received on August 27, 2022, at 10:42 a.m. EST; August 29, 2022, at 8:46 a.m. EST; August 30, 2022, at 5:34 p.m. EST; August 31, 2022, at 4:58 p.m. EST; and September 2, 2022, at 8:39 a.m. EST.

76.     During the September 2, 2022, call, which Mr. Sica answered, a call center employee indicated that one payment of $146.97 was made on Mr. Sica's Minto Money account, but that two others were returned given insufficient funds in Mr. Sica's account. In response, Mr. Sica revoked his ACH consent, asked for Minto Money to cease and desist collection efforts, and asked to be placed on Minto Money's do-not-call list.

## Clarity Knowingly Facilitates Loansharking

77.     Clarity is a nationwide consumer reporting agency which primarily services the needs of online payday lenders like Minto Money – *e.g.*, lenders making short-term, small-dollar loans at triple-digit interest rates.

78.     Clarity maintains terabytes of proprietary data specifically tailored to assist online, subprime lenders in evaluating potential borrowers, including

consumers' checking account histories, employment and salary data, and past payday loan experiences.

79.    Clarity then supplements this data with information from its parent company, Experian Information Solutions, Inc. ("Experian"), one of the "Big 3" nationwide CRAs, as well as with data from other specialty CRAs, including Chex Systems.

80.    Clarity merges its own data with that obtained from Experian and Chex Systems into one report, which it then sells to the online lender.

81.    Indeed, on July 11, 2022, the date Mr. Sica applied for his Minto Money loan, Clarity sold a consumer report regarding Mr. Sica to Minto Money. **SEE PLAINTIFF'S EXHIBIT H**.

82.    On information and belief, Clarity's consumer report regarding Mr. Sica was obtained by a non-tribal service provider, acting on behalf of Minto Money.

83.    Clarity has extensive policies in place to conduct due diligence on potential new customers, which includes, in most cases, sending an investigator to the primary business office of the lender.

84.    In situations where a lender is "tribally" owned but obtains consumer reports through a non-tribal service provider, Clarity typically sends its investigator to the offices of the service provider.

85. Clarity also examines the states the lender does business in, and the lender's website, including pages which show the interest rates, terms, and fees assessed.

86. Clarity has had numerous lawsuits filed against it concerning its provisioning of credit reports to online payday lenders with sham tribal affiliation.

87. Clarity has also produced several detailed reports for the online lending industry, such as its 2019 *Alternative Financial Services Lending Trends Insights into the Industry and its Consumers*, which it stated analyzed 350 million loan applications and 25 million loans. Most of the loans were small-dollar, short-term loans made by online lenders.

88. Clarity thus knew, when furnishing a consumer report regarding Mr. Sica, that the data it was providing was in connection with the making of a loan at a triple-digit interest rate.

89. Clarity's assistance in Minto Money's "rent-a-tribe" scheme is of critical importance.

90. Absent the trove of data Clarity knowingly supplied for use by Minto Money, no such loan could have, or would have, been made to Mr. Sica.

91. Beyond this, Clarity accepts tradeline data from Minto Money, which data includes loan amounts, payments due, and payment history.

92. Indeed, Minto Money, or its service provider, reported Mr. Sica's loan to Clarity. **SEE PLAINTIFF'S EXHIBIT I**.

93. Minto Money reported that Mr. Sica's loan was in the principal amount of $1,100.00, opened July 11, 2022, with a first due date of July 22, 2022.

94. Minto Money also reported that the loan had a balance of $1,532.00, last updated August 8, 2022, meaning Mr. Sica's loan balance increased by over 39% in under a month.

95. Clarity was thus on notice that Mr. Sica's loan charged interest at an annual rate which vastly exceeded the maximum legal rate in most states.

## CLASS ACTION ALLEGATIONS

96. Plaintiff brings this matter as a Class Action, pursuant to Federal Rule of Civil Procedure 23(a) and 23(b)(3), on behalf of himself and the following Classes:

**The "New Jersey Loan Class":**

**All natural persons within the State of New Jersey who obtained a loan from Minto Money within the last six (6) years preceding the filing of this Complaint, wherein the annual percentage rate (APR) of interest on said loan exceeded sixteen percent (16%).**

**The "National Loan Class":**

**All natural persons within any state in the United States of America, other than Delaware, Missouri, Utah, or Nevada, who obtained a loan from Minto Money within the last four (4) years preceding the filing of this Complaint, wherein the annual**

**percentage rate (APR) of interest on said loan exceeded ninety percent (90%).**

**The "Clarity Class" (together with The New Jersey Loan Class and the National Loan Class, the "Classes"):**

**All natural persons within the United States of America whom Clarity sold a consumer report regarding, for use by Minto Money in conjunction with a loan application, within the last four (4) years preceding the filing of this Complaint.**

97. **Numerosity. Fed R. Civ. P. 23(a)(1).** The Class members are so numerous that joinder of all of them is impractical, as Plaintiff believes that there are at least one thousand (1,000) similarly situated persons in New Jersey alone, and at least ten thousand (10,000) in the United States. Minto Money markets itself heavily and makes a considerable number of loans to New Jersey consumers and consumers throughout the United States. Minto Money obtains a consumer report from Clarity for all, or almost all of these consumers. Although the precise number of Class members is unknown, the names and addresses of potential Class members are identifiable through documents and business records maintained by Isaacson, MDC, Minto Money, Bedco, and Clarity.

98. **Existence and Predominance of Common Questions of Law and Fact. Fed. R. Civ. P. 23(a)(2).** There are questions of law and fact that are common to the Classes and which predominate over questions affecting any individual class member. Specifically, these common questions include, without limitation:

a. The nature, scope, and operations of the wrongful practices of Defendants;

b. Whether the interest rates charged by Defendants are violative of state usury laws;

c. Whether Defendants engaged in a course of unfair, unlawful, fraudulent and/or pernicious conduct in their lending and loan practices;

d. Whether Defendants knew or should have known that their business practices were unfair and/or unlawful;

e. Whether Defendants owed a duty of care to Plaintiff and the Classes;

f. Whether Defendants conspired together in an unlawful criminal enterprise;

g. Whether Defendants harmed Plaintiff and the Classes; and,

h. Whether Defendants were unjustly enriched by their unlawful and unfair business practices.

99. **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiff's claims are typical of the claims of each Class member, which all arise from similar operative facts and are based upon the same legal theories. Minto Money makes loans to New Jersey consumers, and consumers nationwide, at rates vastly exceeding the maximum lawful rate under applicable state law. Minto Money obtains a consumer report from Clarity for all, or almost all, of these consumers. Minto Money then uses a series of

pre-written email messages to collect these usurious debts, and, on information and belief, the emails received by Mr. Sica are identical to the emails received by thousands of other consumers in New Jersey and throughout the United States. Plaintiff has no interest adverse or antagonistic to the interests of other members of the Classes and has the same claims for statutory damages that he seeks for absent Class members.

100. **Adequacy of Class Representation. Fed. R. Civ. P. 23(a)(4).** Plaintiff is an adequate representative of the Classes and will fairly and properly protect the interests of the Classes. Plaintiff has retained experienced counsel who have several complex consumer class action cases, including those protecting consumers from usurious consumer loans. Plaintiff's counsel are competent in the prosecution of class action litigation and intend to prosecute this action vigorously. Plaintiff and his counsel will fairly and adequately protect the interests of members of the Classes.

101. **Predominance and Superiority. Fed. R. Civ. P. 23(b)(3).** Questions of law and fact common to the Class members predominate over questions affecting only individual Class members. Under the totality of the circumstances, a Class Action is superior to other available methods for the fair and efficient adjudication of the controversy. The Defendants' conduct described in this Complaint stems from common and uniform practices, resulting in systematic violations of state and federal

law. Members of the Classes do not have an interest in pursuing individual claims against the Defendants as the amount of each Class member's individual claim is small compared to the expense and burden of individual prosecution. Class certification will obviate the need for unduly duplicative litigation that might result in inconsistent judgments concerning the Defendants' practices. Moreover, management of this action as a Class Action will not likely present any difficulties. In the interests of justice and judicial efficiency, it would be desirable to concentrate the litigation of all Class members' claims in a single forum.

102. Absent a Class Action, the Class members will continue to have their rights violated and will continue to suffer monetary and other damages.

103. Defendants' actions are generally applicable to the entire Classes, and accordingly, the relief sought is appropriate with respect to the entire Classes.

104. All conditions precedent to this action have occurred, been satisfied, or waived.

### COUNT I
### <u>VIOLATIONS OF THE CONSUMER FRAUD ACT</u>
### <u>*Against the Lender Defendants Only*</u>
### <u>*New Jersey Loan Class Only*</u>

105. Plaintiff repeats and realleges all prior allegations as if set forth at length herein.

106. The Consumer Fraud Act ("CFA") prohibits:

> The act, use or employment by any person of any unconscionable commercial practice, deception, fraud,

false pretense, false promise, misrepresentation, or the knowing concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate or with the subsequent performance of such person as aforesaid . . ..

N.J. Stat. § 56:8-2.

107. "[T]he New Jersey Supreme Court has directed that the [CFA] be interpreted broadly to effectuate its purpose of eliminating sharp practices and dealings in the marketing of merchandise . . .." *Chulsky v. Hudson Law Offices, P.C.*, 777 F. Supp. 2d 823, 838 (D.N.J. 2011) (internal quotation marks omitted).

108. "By its terms, the CFA is applicable to the provision of credit." *Lemelledo v. Benefit Mgmt. Corp.*, 150 N.J. 255, 265 (1997).

109. Moreover, the "definition of 'merchandise' as 'anything offered, directly or indirectly to the public for sale' is more than sufficiently broad to include the sale of credit." *Id.*

110. Here, the Lender Defendants are "person[s]," as that term is defined by the CFA, because they are each a "natural person or his legal representative, partnership, corporation, company, trust, business entity or association, and any agent, employee salesman, partner, officer, director, member, stockholder, associate, trustee or cestuis que trustent thereof[.]" N.J. Stat. § 56:8-1(d).

111. The Lender Defendants' provision of credit to Plaintiff and other Class Members constitutes a "sale," as that term is defined by the CFA, because such

provision of credit constituted the "sale, rental or distribution, offer for sale, rental or distribution or attempt directly or indirectly to sell, rent or distribute" of credit to Plaintiff and other Class Members.

112. The Lender Defendants engaged in an "unconscionable commercial practice" because, by charging Plaintiff and other Class Members interest rates violating state usury laws, they engaged in an activity that was unfair and unjust which materially departed from standards of good faith, honesty in fact and fair dealing in the public marketplace, *see D'Ercole Sales, Inc. v. Fruehauf Corp.*, 206 N.J. Super., 11, 29 (App. Div. 1985).

113. Particularly, the Lender Defendants' unconscionable commercial practice included their provision to Plaintiff credit at an interest rate of 653.65%, which was approximately 37 times the legal rate of interest for his loan in New Jersey.

114. The Lender Defendants' unconscionable commercial practice also included their collection and several attempts (by email and by telephone) at collecting on a consumer debt that grossly violated New Jersey's usury laws.

115. As a direct and proximate result of the Lender Defendants' unconscionable commercial practices, both Plaintiff and Class Members were harmed because they lost money when they paid unlawful additional interest on the principal balances of their respective loans.

116. **WHEREFORE**, Plaintiff and the New Jersey Loan Class pray for relief as follows:

    a.  Actual damages;

    b.  A refund of all moneys acquired by means of the Lender Defendants' unconscionable commercial practices pursuant to N.J. Stat. § 56:8-2.12;

    c.  An award of threefold the damages sustained by Plaintiff and the Class pursuant to N.J. Stat. § 56:8-19;

    d.  An award of reasonable attorneys' fees, filing fees and reasonable costs of suit pursuant to N.J. Stat. § 56:8-19;

    e.  An order voiding the usurious interest rates attached to the loans of Plaintiff and the Class; and

    f.  Such other legal and/or equitable relief as the Court deems just and proper.

**COUNT II**
**<u>UNJUST ENRICHMENT</u>**
***<u>Against the Lender Defendants Only</u>***
***<u>On behalf of the New Jersey Loan Class and the National Loan Class</u>***

117. Plaintiff repeats and realleges all prior allegations as if set forth at length herein.

118. The Lender Defendants have been unjustly enriched by the funds that they have received from Plaintiff and the Classes.

119. The collection of those funds by the Lender Defendants have conferred a benefit on the Lender Defendants.

120. The Lender Defendants know that they received a benefit by receiving funds from Plaintiff and the Classes.

121. The Lender Defendants' retention of the benefits conferred on them by Plaintiff and the Classes based on illegal means would be unjust.

122. The Lender Defendants should be ordered to disgorge or provide restitution to Plaintiff and the Classes.

123. The disgorgement or restitution should include any profits or other benefits enjoyed by the Lender Defendants as a result of the receipt of the Plaintiff and the Classes' funds.

124. **WHEREFORE**, Plaintiff, the New Jersey Loan Class, and the National Loan Class pray for a money judgment for restitution or disgorgement of all amounts collected by the Lender Defendants from Plaintiff and the Classes including any profits or other benefits enjoyed by the Lender Defendants as a result of receiving the funds from them.

**COUNT III**
**VIOLATIONS OF THE RACKETEER INFLUENCED AND CORRUPT**
**ORGANIZATION ACT – 18 U.S.C. § 1962(c)**
*__Against the Lender Defendants only__*
*__On behalf of the New Jersey Loan Class and the National Loan Class__*

125.   Plaintiff repeats and realleges all prior allegations as if set forth at length herein.

126.   Defendant Isaacson is an individual and person as defined by 18 U.S.C. § 1961(3) and within the meaning of 18 U.S.C. § 1962(c).

127.   Defendants Minto Money, MDC, and Bedco are corporate entities and persons as defined by 18 U.S.C. § 1961(3) and within the meaning of 18 U.S.C. § 1962(c).

128.   18 U.S.C. § 1961(6) defines an "unlawful debt" as any debt which is unenforceable under State or Federal law in whole or in part as to the principal or interest, because of the laws relating to usury and was incurred in connection with the business of lending money at a rate usurious under State or Federal law, where the usurious rate is at least twice the enforceable rate.

129.   18 U.S.C. § 1962(a) includes as prohibited activity any person who receives income derived directly or indirectly from a pattern of racketeering activity, or through collection of an unlawful debt.

130.   18 U.S.C. § 1962(c) prohibits any person associated with any enterprise from conducting, participating directly or indirectly, in the conduct of the enterprise's affairs through collection of unlawful debt.

131.   As described in detail herein, the Lender Defendants are a group of individuals associated in fact, although they are not a single legal entity. Particularly, Defendant Isaacson is the CEO of MDC and the General Manager of Minto Financial, and upon information and belief, controls Minto Money through MDC and Bedco.

132.   Together, the Lender Defendants work toward a common goal of operating a business that issues consumer loans, as well as collectively work as an enterprise to achieve their common goal of misleading the public and issuing usurious consumer loans that violate applicable lending laws.

133.   As described in detail herein, the Lender Defendants are part of an enterprise that engages in business affecting interstate commerce and that conspires together to lend and collect money at usurious interest rates exceeding twice the rate prohibited by New Jersey usury laws, as well as every other State's usury laws.

134.   Through the conduct described in detail herein, the Lender Defendants all have caused actual harm to Plaintiff and all those similarly situated by their violations of 18 U.S.C. § 1962(c).

135.    **WHEREFORE**, Plaintiff, the New Jersey Loan Class, and the National Loan Class pray for relief as follows:

a. All monetary gains, profits, and advantages for the Lender Defendants' acts of racketeering in violation of 18 U.S.C. § 1962, *et seq.*;

b. An order divesting the Lender Defendants of interest, direct or indirect, in their enterprise;

c. An order imposing reasonable restriction on the future activities or investments of the Lender Defendants, including, but not limited to, prohibiting the Lender Defendants from engaging in the same type of endeavor as the enterprise engaged in, the activities of which affect interstate commerce;

d. Treble damages pursuant to 18 U.S.C. § 1964(c);

e. Reasonable attorneys' fees and costs;

f. An order voiding the usurious interest rates attached to the loans of Plaintiff and the Classes; and

g. Such other and further relief the Court may deem just and proper.

**COUNT IV**
**VIOLATIONS OF THE RACKETEER INFLUENCED AND CORRUPT
ORGANIZATION ACT – 18 U.S.C. § 1962(d)**
*All Defendants*
*All Classes*

136.   Plaintiff repeats and realleges all prior allegations as if set forth at length herein.

137.   Defendant Isaacson is an individual and person as defined by 18 U.S.C. § 1961(3) and within the meaning of 18 U.S.C. § 1962(d).

138.   Defendants Clarity, Minto Money, MDC, and Bedco are corporate entities and persons as defined by 18 U.S.C. § 1961(3) and within the meaning of 18 U.S.C. § 1962(d).

139.   18 U.S.C. § 1961(6) defines an "unlawful debt" as any debt which is unenforceable under State or Federal law in whole or in part as to the principal or interest, because of the laws relating to usury and was incurred in connection with the business of lending money at a rate usurious under State or Federal law, where the usurious rate is at least twice the enforceable rate.

140.   18 U.S.C. § 1962(a) includes as prohibited activity any person who receives income derived directly or indirectly from a pattern of racketeering activity, or through collection of an unlawful debt.

141.   18 U.S.C. § 1962(c) prohibits any person associated with any enterprise from conducting, participating directly or indirectly, in the conduct of the enterprise's affairs through collection of unlawful debt.

142.   As described in detail herein, the Defendants are a group of individuals associated in fact, although they are not a single legal entity.

143.   Particularly, Defendant Isaacson is the CEO of MDC and the General Manager of Minto Financial, and on information and belief, controls Minto Money through MDC and Bedco.

144.   Further, Clarity is associated in fact with the other Defendants by virtue of its ongoing business relationship with Minto Money, whereby it provides the underlying data necessary for Minto Money to evaluate potential borrowers for its high interest rate loans.

145.   Indeed, Clarity maintains terabytes of proprietary data specifically tailored to assist Minto Money in evaluating potential borrowers, and on information and belief, investigates and/or has investigated Minto Money's lending terms, including the interest rates and fees Minto Money charges consumers.

146.   Therefore, on information and belief, Clarity knows of Minto Money's unlawful lending practices but nevertheless continues to assist Minto Money and the other Defendants in their unlawful scheme.

147.   Together, the Defendants conspired to issue and collect usurious consumer loans that violate applicable lending laws.

148.   The Defendants each participated in this conspiracy. The Lender Defendants operated Minto Money, and Clarity provided the consumer data necessary for its operation.

149.   The Defendants were also each aware of the purpose of the conspiracy – to issue and collect illegal loans through Minto Money.

150.   Through the conduct described in detail herein, the Defendants all have caused actual harm to Plaintiff and all those similarly situated by their violations of 18 U.S.C. § 1962(d).

151.   **WHEREFORE**, Plaintiff and the Classes pray for relief as follows:

   a.   All monetary gains, profits, and advantages for the Defendants' acts of racketeering in violation of 18 U.S.C. § 1962, *et seq.*;

   b.   An order divesting the Defendants of interest, direct or indirect, in their enterprise;

   c.   An order imposing reasonable restriction on the future activities or investments of the Defendants, including, but not limited to, prohibiting the Defendants from engaging in the same type of endeavor as the enterprise engaged in, the activities of which affect interstate commerce;

d. Treble damages pursuant to 18 U.S.C. § 1964(c);

e. Reasonable attorneys' fees and costs;

f. An order voiding the usurious interest rates attached to the loans of Plaintiff and the Classes; and

g. Such other and further relief the Court may deem just and proper.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff having set forth the claims for relief against Defendants, respectfully requests this Court enter a Judgment against Defendants as follows:

a. That this action be certified as a Class Action, Plaintiff be appointed as the representative of the Classes, and Plaintiff's attorneys be appointed Class Counsel;

b. Actual damages;

c. A refund of all moneys acquired by means of Defendants' unconscionable commercial practices pursuant to N.J. Stat. § 56:8-2.12;

d. An award of threefold the damages sustained by Plaintiff and the Classes pursuant to N.J. Stat. § 56:8-19;

e. An award of reasonable attorneys' fees, filing fees and reasonable costs of suit pursuant to N.J. Stat. § 56:8-19;

f.  Restitution or disgorgement of all amounts collected by the Defendants from Plaintiff and the Classes including any profits or other benefits enjoyed by Defendants as a result of receiving the funds from them;

g.  All monetary gains, profits, and advantages for Defendants' acts of racketeering in violation of 18 U.S.C. § 1962, *et seq.*;

h.  An order divesting Defendants of interest, direct or indirect, in their enterprise;

i.  An order imposing reasonable restriction on the future activities or investments of Defendants, including, but not limited to, prohibiting Defendants from engaging in the same type of endeavor as the enterprise engaged in, the activities of which affect interstate commerce;

j.  Treble damages pursuant to 18 U.S.C. § 1964(c);

k.  Reasonable attorneys' fees and costs; and

l.  Such other and further relief the Court may deem just and proper.

//

//

//

//

//

//

## JURY TRIAL DEMAND

**PLEASE TAKE NOTICE** that the Plaintiffs hereby demand a trial by jury as to all parties.

Dated: November 4, 2022

**KAZEROUNI LAW GROUP, A.P.C.**

By: /s/ Ross H. Schmierer
Ross H. Schmierer, Esq.
Abbas Kazerounian, Esq.
(*Pro Hac Vice* Forthcoming)

Jason Ibey, Esq.
(*Pro Hac Vice* Application Forthcoming)
3000 Atrium Way, Suite 200
Mount Laurel, New Jersey 08054
(T): (856) 259-4800
ross@kazlg.com
ak@kazlg.com
jason@kazlg.com

*Attorneys for Plaintiff*

//
//
//
//
//
//
//
//
//

## CERTIFICATION PURSUANT TO L. CIV. R. 11.2

I certify that, to the best of my knowledge, this matter is not the subject of any other action pending in any court or of any pending arbitration or administrative proceeding.

Dated: November 4, 2022

By:    s/ Ross H. Schmierer
Ross H. Schmierer, Esq.
3000 Atrium Way, Suite 200
Mount Laurel, New Jersey 08054
(T): (856) 259-4800
ross@kazlg.com
*Attorneys for Plaintiff*